IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVON R. HAYES, | : | |
| | : | No. _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN E. WETZEL, | : | |
| Secretary of Department of Corrections, | : | |
| SHIRLEY MOORE SMEAL, Executive | : | |
| Deputy Secretary of Department of | : | |
| Corrections, TABB BICKELL, | : | |
| Executive Deputy Secretary | : | |
| for Institutional Operations, | : | |
| and JAMEY LUTHER, Superintendent | : | |
| of SCI Smithfield, | : | |
| | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT

Davon Hayes, by and through his counsel, Schnader Harrison Segal & Lewis LLP, the Pennsylvania Institutional Law Project ("PILP"), Abolitionist Law Center ("ALC"), Amistad law Project ("ALP") and American Civil Liberties Union of Pennsylvania ("ACLU-PA"), hereby files this Complaint against John E. Wetzel, the Secretary of the Pennsylvania Department of Corrections ("DOC"), Shirley Moore Smeal, the Executive Deputy Secretary of the DOC, Tabb Bickell, the Executive Deputy Secretary for Institutional Operations of the DOC, and Jamey Luther, Superintendent of SCI Smithfield, and in support thereof, aver as follows:

## INTRODUCTION

1.      In September 2018, the DOC initiated a series of new measures intended to prevent drugs from entering DOC facilities. These included the introduction of drone-defense measures at DOC prisons, enhanced search protocols for both people incarcerated in DOC facilities and their visitors, restrictions on incoming books and publications, and a new policy that prevents incarcerated people from receiving any mail, whether legal or non-legal, that contains original documents. This lawsuit relates only to the changes in the DOC's handling of legal mail.

2.      Although the DOC is not aware of any instance whereby attorneys have introduced contraband into DOC facilities via legal mail, DOC officials started confiscating all incoming legal mail and holding it for 45 days, only allowing recipients a photocopy of their correspondence. This new policy disregards the privileged nature of attorney-client communications and irrevocably compromises the confidentiality of those communications. The new policy severely curtails Plaintiff Davon Hayes' ability to communicate with his attorneys in the Office of the Federal Public Defender.

3.      Plaintiff Hayes has a habeas petition pending in the U.S. District Court for the Western District of Pennsylvania and is represented by the Federal Public Defender for the Western District of Pennsylvania. Before enactment of the

PHDATA 6617372_2

new policy, he regularly communicated with his attorneys through the mail. Since the new legal-mail policy went into effect, however, Mr. Hayes' attorneys have been forced to cease all privileged communications with their clients, including Mr. Hayes, because they cannot be assured of the confidentiality of those communications.

4.      Absent evidence that attorneys use the mails to send contraband to clients, the DOC's new legal mail policy is an exaggerated, irrational response to a non-problem that deprives Mr. Hayes of an indispensable – and often the only viable -- means of communicating with his attorneys, thereby seriously undermining his lawyers' ability to provide him with zealous and effective legal representation. The DOC's unwarranted interference with attorney-client communications violates the First Amendment to the U.S. Constitution.

5.      Mr. Hayes has suffered and will continue to suffer irreparable harm because of the DOC's substantial interference with his First Amendment right to engage in confidential communications with his attorneys regarding ongoing legal matters and to have privileged legal mail kept confidential. Mr. Hayes seeks preliminary, and thereafter permanent, injunctive relief.

## JURISDICTION AND VENUE

6.     This action to vindicate plaintiff's First Amendment rights is brought under 42 U.S.C. § 1983. This Court has jurisdiction over this action under 28 U.S.C. § 1331.

7.     Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) in that the parties are subject to personal jurisdiction within the Middle District of Pennsylvania, and events that gave rise to this action occurred within the Middle District of Pennsylvania.

## PARTIES

8.     Davon R. Hayes is a 33-year-old man who is housed in DOC custody at SCI Smithfield in Huntingdon, PA. Mr. Hayes filed a petition for writ of habeas corpus in the U.S. District Court for the Western District of Pennsylvania that is pending.  The Federal Public Defender for the Western District of Pennsylvania is representing Mr. Hayes on his habeas petition.

9.     John E. Wetzel is the current Secretary of the DOC. Defendant Wetzel is being sued in his official capacity.

10.     Shirley Moore Smeal is the Executive Deputy Secretary of the DOC. Defendant Smeal is being sued in her official capacity.

PHDATA 6617372_2

11.     Tabb Bickell is the Executive Deputy Secretary for Institutional Operations for the DOC. Defendant Bickell is being sued in her official capacity.

12.     The DOC operates 25 state correctional facilities throughout the Commonwealth that house offenders of the Pennsylvania crimes code.  The DOC's Central Office is located at 1920 Technology Parkway, Mechanicsburg, PA 17050.

13.     Jamey Luther is the Superintendent of SCI Smithfield. She is responsible for carrying out the DOC's new legal-mail policy at that institution. Defendant Luther is being sued in her official capacity.

## FACTUAL BACKGROUND

**Confidential Communications Between Attorneys and Clients**

14.     Courts have recognized for centuries that communications between a client and his/her attorney must be protected from disclosure to third parties. In fact, confidentiality is described as the "cornerstone" of the attorney-client relationship.

15.     Clients who fear disclosure of their communications may be reluctant to confide important facts to their attorneys. The lack of free communication inhibits the ability of attorneys to provide advice and representation. The need for confidentiality, therefore, is essential to the attorney-client relationship.

PHDATA 6617372_2

16.     Privileged communications between Mr. Hayes and his attorneys include, among other things, questions from his attorneys about facts that could be important to his pending habeas petitions, answers to those questions, questions from Mr. Hayes as to how he can act to preserve or protect his legal rights, discussions about legal strategy or drafts of pleadings or discovery responses, and attorneys' assessment of the his case or certain issues within that case.

17.     Confidentiality of attorney-client communications is critical not only to promote the effective legal representation of the client's interests, but also to the overall administration of justice. *See, e.g., Hunt v. Blackburn*, 128 U.S. 464, 470 (1888); *In re Search Warrant B-21778*, 513 Pa. 429, 441 (1987).

18.     Indeed, attorneys have an ethical duty to protect from disclosure their communications with their clients.  *See* Pennsylvania Rules of Prof'l Conduct, r. 1.6(d) (2018). When the confidentiality of those communications is threatened, attorneys are duty bound to take steps to ensure that those communications remain confidential.

**Attorney Communications with Incarcerated Individuals**

19.     Although imprisonment necessarily involves a loss of certain privacy and liberty rights, it is well-established that people in prison retain First Amendment rights and the right to counsel. "Prison walls do not form a barrier

separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S. Ct. 2254, 2259 (1987).

20.     The need for confidentiality of attorney-client communications is particularly acute in the prison setting. *See, e.g., Lanza v. New York*, 370 U.S. 139 (1962) ("[Even] in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection . . ." (citation omitted)).

21.     The U.S. Court of Appeals for the Third Circuit has held that "opening properly marked incoming attorney or court mail outside a prisoner's presence, or reading such mail, infringes the Constitution." *Bieregu v. Reno*, 59 F.3d 1445, 1450-51 (3d Cir. 1995) (citing decisions from other Courts of Appeals). The Court held that the failure to safeguard attorney-client confidentiality "chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court." *Beiregu*, 59 F.3d at 1452. Indeed, the U.S. Supreme Court has ruled that the *only* way to ensure the confidentiality of legal mail sent to incarcerated people is to require that prison officials open legal mail only in the presence of the individual to whom it is addressed. *Wolfe v. McDonnell*, 418 U.S. 539, 576-77, 94 S. Ct. 2963, 2984-85 (1974).

PHDATA 6617372_2

22.     Until recently, the DOC followed a policy for legal mail ("former policy") consistent with these constitutional requirements. In order to distinguish legal mail, which is entitled to heightened constitutional protection, from non-legal mail, the DOC in the early 2000s established a process of assigning "control numbers" to attorneys.

23.     Attorneys would affix the DOC-issued control number to an envelope containing privileged correspondence to individuals in DOC facilities. If the DOC established that the control number matched the attorney's letterhead, the DOC treated the correspondence as privileged and processed it as legal mail.

24.     Officers opening legal mail were supposed to take care that the attorney control number was removed or blacked out before the correspondence was provided to the recipient. That way, the recipients would not be able to share the control numbers with non-lawyers, who might then try to evade the more vigorous inspection process associated with non-legal mail by falsely labeling their correspondence as legal mail. In other words, each attorney's control number was to remain confidential.

25.     The DOC's new legal-mail policy has not changed this aspect of the legal-mail process.

26.     Under the former policy, once DOC staff verified via the control number that the correspondence was legal mail, corrections officers would open

the mail in front of the inmate to briefly check for contraband. Assuming no contraband was found, the staff member would give the legal mail to its recipient. *See* DC-ADM 803 (effective date October 29, 2015), a copy of which is attached hereto as Exhibit 1. Upon information and belief, this process was routinely completed in a matter of seconds.

27.    Under the former policy, opened legal mail was never in the custody or possession of prison officials other than for this brief check for contraband. Because prisoners received the original correspondence after DOC officials opened and searched it, and were present at all times when DOC officials handled it, prisoners, and the attorneys who corresponded with them, had reasonable assurance that DOC staff and officials were not reading the legal mail or sharing it with others.

28.    Most prison systems use the above-described procedure for opening prisoner legal mail. It has been approved by the Courts. The federal Bureau of Prisons has employed a similar procedure since 1985, which expressly prohibits reading or copying the correspondence. *See* 28 C.F.R. §540.18 (1994).

### DOC's Lockdown and Establishment of New Policies

29.    On August 29, 2018, the DOC initiated a 12-day state-wide lockdown of all SCIs, during which all inmate visits were cancelled, the delivery of books

and publications to incarcerated individuals was suspended, and the DOC stopped processing all mail, including legal mail.

30.     After the lockdown ended, the DOC returned all mail received during the lockdown, including legal mail, to its sender unopened. This included mail from the courts and attorneys.

31.     The DOC's stated reason for the lockdown was alleged "reports of multiple staff members being sickened by unknown substances over the past few weeks." *FAQ -- New Procedures*, Pennsylvania Department of Corrections (Oct. 26, 2018, 11:48 AM), https://www.cor.pa.gov/Initiatives/Pages/FAQ-New-Procedures.aspx. A copy of the "FAQ -- *New Procedures*" is attached hereto as Exhibit 2.

32.     As to how these unknown substances were entering its facilities, the DOC stated as follows:

> There are seven points of entry for contraband to enter the facility: mail, legal mail, visits, staff, books/publications, drones and inmates returning to the DOC after having been released. It's speculated that the majority of contraband enters the facilities through the mail.

*See* Ex. 2.

33.     On September 4, 2018, the DOC issued a public statement proclaiming, *inter alia*, that "[f]rom January – June 2018 the Department saw 2,034 drug incidents involving 1,802 inmates. Of these incidents, 309 involved mail & visitors." A copy of the media release is attached hereto as Exhibit 3.

PHDATA 6617372_2

34.     The DOC has not publicly broken down the 309 figure to specify how many of those involved visitors and of the remaining ones involving the mail how many came from legal mail.

35.     Following the lockdown, the DOC adopted a range of new measures to combat contraband entering the prisons. *See* Exhibit 2 (FAQ -- *New Procedures*). The change to handling of legal mail, at issue in this litigation, is just one of several new interdiction measures.

36.     New drug-interdiction measures beyond changes to legal-mail processing include:

   a. A significant change to how non-legal mail is processed whereby all such mail is sent to a DOC third-party vendor in Florida, who will scan the correspondence, transmit the scan to the respective prisoners' DOC facility, which will print the scan and give the copy to the prisoner, Ex. 2 at 1-5;

   b. Restrictions on prisoners' ability to receive books and publications, including a prohibition on prisoners receiving books directly from publishers, from various non-profit prisoner-book-donation organizations, and restrictions on assorted publication subscriptions, all of which were previously allowed, *id.* at 6-8;

c.  Increased scrutiny of visitors, i.e., searches, and various restrictions on items visitors can bring with them and on vending items previously available in SCI visiting rooms, and enhanced penalties for visitation-related violations on both the prisoner and the visitor, *id*. at 8-12;

d.  Expanded use of "body scanners" and introduction of "improved ion scanners," Ex. 3 at 2-3;

e.  "Expansion of drone detection software and capabilities" to help "identify and combat the introduction of contraband via drones," *id.* at 2;

f.  "Enhanced commitment reception protocol" to tighten screening of return parole violators and newly arriving prisoners, which the DOC described as "problematic and another way that contraband is introduced into the facilities," *id*. at 2; and

g.  A new "drug hotline" through which anyone, including prisoners and people wishing to remain anonymous, "can call to report information related to the introduction of drugs or possession of drugs in a SCI by inmates, visitors, or staff members," *id.* at 3.

37.   The DOC subsequently adopted a new policy that prevents all non-legal mail from entering any SCI. See DC-ADM 803 (Effective date: October 3, 2018), a copy of which is attached hereto as Exhibit 4.

38.     Under the new non-legal mail policy, all incoming, non-privileged correspondence must be addressed and sent to the DOC's contracted central incoming mail processing center in St. Petersburg, Florida, which is operated by a company called Smart Communications. When Smart Communications receives mail addressed to a person incarcerated within the DOC, it will open and electronically scan the mail and then electronically transmit the scanned copy to the SCI where the person is imprisoned. SCI staff at that facility will then print the scanned copy and deliver it.

### DOC's New Legal Mail Policy

39.     The same October 3 policy also regulates legal mail (that portion of DC-ADM 803 that relates to legal mail is hereinafter the "New Legal Mail Policy"). The DOC's new policy refers to legal mail as "incoming privileged correspondence." It includes:

- "[m]ail from an inmate's attorney that is either hand-delivered to the facility by the attorney or delivered through the mail system and identified with a control number issued to the sender by the Department's Office of Chief Counsel";

- mail from a court; and

PHDATA 6617372_2

- mail from an elected or appointed federal, state, or local official who has sought and obtained a control number issued by the Department's Office of Chief Counsel [where the communication] involves matters related to a confidential investigation process or similar concerns."

DCM-ADM 803 (Exhibit 4), Glossary of Terms, page 4.

40.    The DOC is not aware of any instance in which bona fide legal mail has been a source of contraband, including the "unknown substances" that prompted the lockdown.

41.    The DOC is aware of some unspecified number of instances where an incarcerated individual or some other person has learned an attorney control number and provided that number to someone else so that regular mail can be disguised as attorney mail.

42.    Under the former policy, officers were directed to "black out" or remove the attorney control number before distributing legal mail, but on occasion, the number is not removed or completely blacked out, thus allowing people to learn the number and pass it along to others. The DOC suspects there may be other ways in which attorney control numbers can be learned by others and used to disguise non-legal mail as legal mail.

43.    The DOC suspects that this illegitimate or fake legal mail may be another possible source of entry for these drugs or other substances.

PHDATA 6617372_2

44.    To account for this possibility, the New Legal Mail Policy institutes a wholesale change in its procedures for processing all incoming legal mail. Now, rather than simply opening the mail in front of the individual to check for contraband, all legal mail is inspected and copied, with the copy given to the recipient and the original stored at the facility.

45.    Specifically, the new policy provides that:

a. "Incoming privileged correspondence will be opened and inspected for contraband in the presence of the inmate to whom it is addressed.

b. The incoming privileged correspondence will then be photocopied in the presence of the inmate and the photocopies of the contents shall be delivered to the inmate.

c. Incoming privileged correspondence delivered to an inmate as described above is to be noted on the Legal Mail Log. The inmate must sign the Legal Mail Log for the mail or the fact that the inmate refused to sign shall be noted.

d. The original incoming privileged correspondence (including the original envelope or packaging) will be sealed in a manila or opaque envelope(s) in the presence of the inmate.  The envelope(s) shall be secured with evidence tape.

PHDATA 6617372_2

e. The envelope(s) will be marked with the inmate's name and number and the sealed envelope(s) will be deposited into a locked/secured receptacle [that is maintained by a vendor]. . ."

Exhibit 4, page 1-12.

46.     Under the New Legal Mail Policy, each DOC facility is responsible for procuring the services of a vendor for the confidential destruction of incoming legal mail. The original incoming legal mail will be maintained for 45 days and then destroyed by the vendor unless the DOC receives a timely request by an individual to access or preserve the original legal mail. The opening of incoming privileged mail in the presence of the inmate also will be video-recorded.  Exhibit 4, page 1-12.

47.     The mere fact that the original legal mail, once opened, is being stored outside the presence of the incarcerated individual eviscerates the assurances of confidentiality that the First Amendment requires. Further, any page-by-page inspection of legal mail would be equivalent to skimming or reading that mail.

**The DOC's Legal Mail Policy Adversely Affects Plaintiff's Ability to Engage in First Amendment-Protected, Confidential Communications with His Attorneys.**

48.     Concerned about the impact of the New Legal Mail Policy on the confidentiality of attorney-client communications and the privileged nature of

those communications, the Federal Public Defender for the Western District of Pennsylvania has informed all of its clients in DOC facilities, including Mr. Hayes, that it can no longer send privileged material to them or any other clients through the mail.

49.    Mr. Hayes also has concerns about receiving privileged communications from his lawyers through the mail because under the New Legal Mail Policy, he cannot be assured that those communications will be confidential.

50.    After receiving his copy, the original legal mail is maintained outside his presence for 45 days or more.  He has no assurances, other than the DOC's say-so, that his privileged communications will be protected and not exposed to others either inadvertently or intentionally.

51.    As currently implemented at SCI Smithfield, Mr. Hayes has additional concerns.    For example, when corrections officers copy legal mail at SCI Smithfield, the recipients cannot see how many copies of the mail are being made. In addition, the original privileged legal correspondence is not being placed in a secure location in view of the recipient. Finally, SCI Smithfield is currently copying legal mail despite not having a contract with a vendor to securely store the original privileged legal documents or destroy them, as the New Legal Mail Policy requires.

PHDATA 6617372_2

52.     Mr. Hayes reasonably fears that corrections officers or other DOC employees will be able to read his privileged legal correspondence while copying the documents, by making multiple copies of the documents, or by accessing the original documents after they have been copied.

53.     Mr. Hayes has no reasonable alternatives to mail for communicating with his attorneys.

54.     Since the New Legal Mail Policy went into effect, attorneys have attempted to communicate with their clients through unmonitored telephone calls and in-person visits instead of through mail.

55.     Neither of these methods of communications is a viable alternative to confidential correspondence through the mail.

56.     In order to have an unmonitored telephone call with an attorney, an individual in DOC custody must ask the correctional facility where he or she is housed to place the attorney on his or her call list so that the individual's phone calls to the attorney's telephone number are not monitored.

57.     It often takes a week or more for facilities to process those requests.

58.     For example, Mr. Hayes requested that his counsel in this case be placed on his phone call list on Monday, October 15. As of Monday, October 22, Mr. Hayes' counsel still had not been placed on his phone call list.

PHDATA 6617372_2

59.     The DOC also allows attorneys to set up unmonitored phone calls with their clients in DOC facilities, but facilities often deny attorneys' requests to schedule those calls.

60.     For example, the Federal Public Defender for the Western District attempted to schedule an unmonitored phone call with one of its clients at SCI Greene, but the facility refused to schedule the call or even to provide a message to the client that his attorney had requested that he call her.

61.     Meeting with clients in person at DOC facilities is not a feasible alternative to correspondence by mail for attorneys whose offices are often hours away from the facility where their client is incarcerated.

62.     Visiting hours at most DOC facilities are limited to 8:30 am to 3:30 pm and only occur on weekends and 2-3 weekdays.

63.     For example, the visiting hours at SCI Smithfield are 8:30 am to 3:30 pm Thursday through Monday.  No visitation may take place on Tuesdays and Wednesdays.

64.     Attorneys must also call ahead to schedule visits to reserve an attorney meeting room in order to have private visits with their clients.  Attorneys frequently also must receive advance permission to bring legal pads, files and pens into the visits.

PHDATA 6617372_2

65.    But even if an attorney has reserved an attorney meeting room in advance, such rooms are not always available when attorneys arrive, forcing them to meet with their clients in the main visiting room where corrections officers and other individuals can overhear their conversations.

66.    In order for an attorney to meet with a client or prospective client at a DOC facility, the incarcerated individual must first request to have the attorney placed on his or her visitation list.

67.    It often takes a week or more for attorneys to be added to an incarcerated person's visitation list.

68.    For example, counsel in this case sought to meet with a prospective client at SCI Greene in October. It took more than a week for counsel to be placed on the individual's visitation list, delaying counsel's planned visit by more than a week due to limited visiting hours at the facility.

69.    Attorneys visiting clients in DOC facilities are also frequently refused permission to hand-deliver documents to, or even share documents with, their clients during in-person visits.

70.    DOC rules prohibit attorneys from hand-delivering documents to their clients unless they obtain special permission from the facility, typically referred to as a "gate pass," in advance.

71.     DOC facilities often deny attorneys "gate passes," thus preventing attorneys from providing confidential legal documents to their clients through any means other than by mailing the documents and subjecting them to the DOC's policy of confiscating privileged documents and copying them.

72.     SCI Greene and SCI Phoenix also prohibit attorneys from sharing documents with their death-row clients during visits.

73.     An Assistant Federal Public Defender for the Middle District of Pennsylvania requested permission on September 19, 2018, to share a privileged draft of a habeas petition with a client on death row at SCI Greene

74.     All visits with death row inmates at SCI-Greene are non-contact, through glass. If an attorney brings documents with her to a legal visit, her client never has physical access to that document. It was the Assistant Federal Public Defender's intention to hold the pages up to the glass for her client's review.

75.     On September 24, 2018, SCI Greene denied the Assistant Federal Public Defender's request to bring 150-200 pages of legal documents into the prison. Prison officials informed her that current policy prohibits counsel from bringing in a large document to review during a legal visit, despite the fact that her client would never have physical access to the document. Prison officials stated that the only option was to mail the document to her client, subjecting it to confiscation and copying under the DOC's new legal-mail policy.

PHDATA 6617372_2

76.     As a result, the Assistant Federal Public Defender was unable to review the privileged draft of the habeas petition with her client and was forced to file a motion for extension of time within which to file the habeas petition, which was granted by this Court. *Hicks v. Wetzel*, No. 1:17-cv-1969 (ECF No. 12).

**The DOC's New Legal Mail Policy Is an Exaggerated Response that Does Not Address the Problem Sought to Be Solved**

77.     There is no valid, rational connection between the risk being addressed (which does not involve legitimate legal mail at all) and the wholesale changes now being implemented.

78.     The New Legal Mail Policy effectively prevents Mr. Hayes and his attorneys from using the mail to engage in confidential communications.

79.     Given the limited access and means by which attorneys and their clients in SCIs can speak by telephone, and the difficulties associated with in-person meetings, communication by mail is essential.

80.     Given the absence of any link between bona fide legal mail and the "unknown substances" that have been introduced into DOC facilities, there is no increased burden or adverse impact on the DOC in allowing people incarcerated in their facilities to continue receiving original incoming legal mail.

PHDATA 6617372_2

81.     To the contrary, the DOC's interest can be better addressed by improving its attorney control number procedure to prevent or minimize the opportunity for fake legal mail.

82.     The New Legal Mail Policy is precisely the type of "exaggerated response" of which the U.S. Supreme Court disapproves. With respect to legal mail, the burden on First Amendment rights and the attorney-client privilege is not reasonably related to the DOC's stated interest or any legitimate penological interest.

83.     As a direct and proximate result of Defendants' New Legal Mail Policy, Plaintiff has been and continues to be harmed.  The new policy deprives his constitutionally protected communications with his attorneys of confidentiality and chills the Plaintiff's exercise of his First Amendment rights.

84.     Unless this Court enjoins, preliminarily and permanently thereafter, Defendants from implementing the new policy, the First Amendment rights of Plaintiff will continue to be abridged.

## COUNT I – VIOLATION OF FIRST AMENDMENT RIGHTS

85.     Plaintiff incorporates by reference paragraphs 1 through 84 of this Complaint as though set forth fully herein.

86.    The First Amendment, as incorporated in the Fourteenth, prohibits states from "abridging the freedom of speech." U.S. Const. Amend. I.

87.    Plaintiff has a protected First Amendment right to free speech. *See, e.g., Hirschkop v. Snead*, 594 F.2d 356, 366 (4th Cir. 1979); *Kuchka v. Kile*, 634 F. Supp. 502, 511 (M.D. Pa. 1985) (citing *Hirschkop)*. Implicit in this right is the right of plaintiff to engage in confidential communications with his attorneys. *Procunier v. Martinez*, 416 U.S. 396, 408-09, 94 S. Ct. 1800 (1974) (both incarcerated people and those with whom they correspond have First Amendment rights that can be infringed by unjustified government interference).

88.    People who are incarcerated "do not forfeit their First Amendment right to use of the mails." *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995).

89.    A pattern and practice of opening legal mail outside the presence of the addressee interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the incarcerated individual's right to freedom of speech. *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006). Any such practice "deprives the expression of confidentiality and chills the inmates' protected expression, *regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications*." *Id*. (emphasis added).  "[T]he only way to ensure that mail is not

read when opened . . . is to require that it be done in the presence of the inmate to whom it is addressed." *Bieregu*, 59 F.3d at 1456 (citing *Wolff v. McDonnell*, 418 U.S. 539, 576–77 (1974)).

90.     The New Legal Mail Policy is not rationally related to a legitimate penological interest, and is therefore void on its face.

91.     Unless injunctive relief is granted, the First Amendment rights of Plaintiff will continue to be infringed upon and chilled, and attorney-client communications will lose their confidential, privileged character.

WHEREFORE, Plaintiff seeks judgment in his favor and against Defendants, and in particular seeks:

> A. A declaration that Defendants' actions violate his rights under the First Amendment to the United States Constitution;
>
> B. An injunction—preliminary and permanent thereafter— enjoining Defendants from copying legal mail and retaining the originals for any amount of time, and disallowing any inspection that would enable officers to skim or read the mail;
>
> C. Costs, interest and attorney's fees; and
>
> D. Any other relief deemed appropriate by the Court.

PHDATA 6617372_2

Respectfully submitted,

*/s/ Keith E. Whitson*
Keith E. Whitson
Pa. I.D. No. 69656 (admission pending)
*/s/ Stephanie A. Short*
Stephanie A. Short
Pa. I.D. No. 324023 (admission pending)
*/s/ Danielle T. Bruno*
Danielle T. Bruno
Pa. I.D. No. 324539 (admission pending)
*/s/ Paul H. Titus*
Paul H. Titus
Pa. I.D. No. 1399 (admission pending)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
2700 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA  15222
Telephone: (412) 577-5220
Facsimile: (412) 577-5190
kwhitson@schnader.com
sshort@schnader.com
dbruno@schnader.com
ptitus@schnader.com


*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz, Esq.
PA ID No. 312631
*/s/ Angus Love*
Angus Love, Esq.
PA ID No. 22392
**Pennsylvania Institutional Law Project**
100 Fifth Ave, Ste 900
Pittsburgh, Pa 15222
Tel: (412) 434-6175
amorgan-kurtz@pailp.org

PHDATA 6617372_2

The Cast Iron Building
718 Arch Street, Suite 304 South
Philadelphia, PA 19106
alove@pailp.org

*/s/ Bret Grote*
Bret D. Grote, Esq.
PA ID No. 317273
*/s/ Quinn Cozzens*
Quinn Cozzens, Esq.
PA ID No. 323353
**Abolitionist Law Center**
P.O. Box 8654
Pittsburgh, PA  15221
Tel:  (412) 654-9070
bretgrote@abolitionistlawcenter.org
qcozzens@alcenter.org

*/s/ Ashley Henderson*
Ashley Henderson (*pro hac vice* pending)
PA I.D. No. 313492
*/s/ Deneekie Grant*
Deneekie Grant (*pro hac vice* pending)
PA I.D. No. 314220
**Amistad Law Project**
P.O. Box 9148
Philadelphia, PA 19139
Tel: (267) 225-5884
ashley@amistadlaw.org
nikki@amistadlaw.org

*/s/ Sara J. Rose*
Sara J. Rose. Esq.
PA ID No.: 204936
*/s/ Witold J. Walczak*
Witold J. Walczak, Esq.
PA ID No.: 62976
**American Civil Liberties Union of Pennsylvania**
247 Fort Pitt Blvd.

Pittsburgh, PA 15222
Tel: (412) 681-7864 (tel.)
Fax: (412) 681-8707
srose@aclupa.org
vwalczak@aclupa.org


*Attorneys for Plaintiff*

Dated:  October 30, 2018

## **VERIFICATION**

I, Davon R. Hayes, hereby swear under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the information herein is true and correct to the best of my knowledge.


Executed on <u>October 22, 2018</u>

*s/ Davon R. Hayes*_____

Davon R. Hayes
